UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| THE ESTATE OF KYRA WARNER by Kimberly Norton, Personal Representative, | ) ) ) |
| Plaintiff, | ) ) |
| v. | )  No. 1:19-cv-00774-RLY-MJD ) |
| WELLPATH, et al., | ) ) |
| Defendants. | ) |

**ORDER ON DEFENDANTS' MOTIONS FOR SANCTIONS**

This matter is before the Court on two motions for sanctions, one filed by Kristi Kay Carpenter, Pamela Hansen, Theresa Lynn Wischmeyer, and Wellpath (collectively "Medical Defendants"), [Dkt. 133], and the other by Anthony Bell, Devon Clark, Thomas Jardich, Troy Love, and the Marion County Sherriff's Office ("MCSO"), [Dkt. 134], against Plaintiff's attorney, Richard A. Waples.  For the reasons set forth below, Defendants' motions for sanctions are **DENIED**.

**I. BACKGROUND**

On July 9, 2018, Kyra Warner was arrested and taken to the Marion County Sherriff's Intake Center.  [Dkt. 1 at 2.]  Shortly before or after her arrest, Kyra Warner ingested a fatal quantity of amphetamines and methamphetamines.  *Id.* at 3.  While in the custody of the MCSO, Warner suffered acute hypoxic respiratory failure, PEA (pulseless electrical activity), cardiac arrest, and suffered a severe anoxic brain injury.  *Id* at 14-15.  Fourteen days later, Warner died at the Eskenazi Hospital.  *Id.* at 15.  Warner's estate brings this suit pursuant to 42 U.S.C. § 1983,

asserting that "Defendants' actions and inactions were deliberately indifferent to the reasonable medical needs of []Warner." *Id.* at 16.

During the course of this litigation, multimedia news provider Reuters interviewed Plaintiff's counsel Richard A. Waples as part of an investigation into deaths of incarcerated individuals. In an article published on October 16, 2020, Reuters provided the following brief summary of the "facts" surrounding the death of Kyra Warner:

> In July 2018, Kyra Warner, 30, went quiet about 90 minutes after arriving at the jail. As her limbs twitched, cellmates called for help, telling nurses and deputies that Warner said she had been using methamphetamine and anti-anxiety drug Xanax.
>
> Jail videos shows Warner unable to walk on her own as deputies moved her to a monitored isolation cell, where they left her on the floor, still twitching. She lay unresponsive as they checked her periodically over two hours—until medical staff found no pulse. She died of an accidental overdose.
>
> "The officers that are watching aren't medically trained," said Rich Waples, a lawyer handling the family's ongoing wrongful death lawsuit against the sheriff and Wellpath, the company providing the jail's healthcare. "If she'd gotten prompt care, they could have reversed the effects of those drugs."
>
> Jail officials denied wrongdoing and noted in their response to the suit that deputies checked on Warner numerous times, but added they are not medical professionals. Wellpath, also contesting the ongoing suit, denied any misconduct.
>
> "We're not built to be the largest mental health hospital in the state," said Colonel James Martin, who oversees the jail. "We're not built to be the largest detox facility in the state." Yet the jail has "more detox beds than any single hospital in the state."
>
> The jail's shortcomings have been documented, including a county-commissioned review in 2016 that found the Fossil "antiquated," with inadequate staffing and design flaws that severely hamper inmate monitoring. In 2018, after another independent study highlighted the jail's challenges, the county approved a new $580 million criminal justice complex, with dedicated facilities to treat mental illness and substance abuse. In 2022, the Fossil will be history.

Peter Elsler, Linda So, Jason Szep, Grant Smith and Ned Parker, Death Sentence: Why 4,998 Died in U.S. Jails Without Getting Their Day in Court, Reuters (Oct 16, 2020, 11:00 AM GMT),

2

https://www.reuters.com/investigates/special-report/usa-jails-deaths/ (hereinafter referred to as "the Article").

The same day Reuters published the Article, Waples filed a notice of protective order violation with the Court. [Dkt. 132.] Waples states, *inter alia,* that Reuters interviewed him "months ago. . . regarding issues of correctional health care, and specifically about lawsuits in which he has represented prisoners who had suffered significant injuries or death while in custody." *Id.* at 1. As part of his interview, Waples provided reporters with copies of the videos capturing Warner's time at Marion County Sherriff's Intake Center. *Id.* at 2. After the initial interview and communications,[1] Reuters contacted Waples again for additional videos he might have in his possession related to the death of individuals while incarcerated. *Id.* At that point, Waples "first realized that the videos he had previously provided could be covered by [the] protective order. . . ." *Id.* Waples reported that he had failed in his attempt to regain custody of the videos from Reuters and stated that he took "complete and sole responsibility for the breach of the protective order and apologize[d] to the Court and opposing counsel for this breach." *Id.*

Shortly thereafter, the Defendants filed the instant motions for sanctions against Waples for 1) violating the protective order by providing confidential videos to Reuters and 2) violating Indiana Rule of Professional Conduct 3.6 for comments he made during the Reuters interview that Defendants allege prejudiced the adjudicative proceedings in this case.

In arguing that sanctions are appropriate, MCSO states

> [i]n addition to giving the videos to the media in violation of the protective order, [Waples] did an on-camera interview about this case that is featured prominently in the Reuters story. His statements were clearly intended to present Plaintiff's version of the facts and, conversely, to place the MCSO defendants in a very poor light by omitting many other important facts showing why the MCSO and its employees are not responsible for Warner's death."

---

[1] It is unclear from the briefing when Reuters initially reached out and interviewed Waples.

[Dkt. 134 at 2.] Defendants find particular fault with the fact that Waples waited until the Article was published to notify the Court and Defendants of the alleged breach of the protective order. *See id.* at 3; [Dkt. 133 at 2].

In response to both Defendants' motions for sanctions, Waples reiterates that he "did not remember about the possible application of the protective order to these videos until after Reuters recontacted [him] on October 7, 2020." [Dkt. 135 at 1.] Waples does not explain why he waited until October 15, 2020, to check the protective order and subsequently contact Reuters about the potential violation. *Id.* In a dramatic turn, Waples asserts in reply that his

> conclusion set forth in Dkt. 132 that the disclosure violated the protective order was incorrect, as defendant Marion County Sheriff did not designate the videos as "confidential" when producing them in discovery, as required by the protective order, and has itself publicly published these same videos. Both actions take the videos outside the scope of the protective order.

*Id.* at 2.

## II. DISCUSSION

In response to Waples' alleged breach of the protective order and Indiana Rule of Professional Conduct 3.6, Defendants ask this Court to sanction Waples. Medical Defendants argue that "the most appropriate sanction for Mr. Waples' violation is to exclude the video in question, or reference thereto, from evidence at trial." [Dkt. 133 at 5.] In addition, Medical Defendants request a monetary sanction of $10,000 plus $550 for each day Waples was in violation of the protective order.[2] [Dkt. 133 at 5-6.] Finally, Medical Defendants request an order prohibiting Waples from discussing this case "in any form with any form of news media." *Id.* at 6. MCSO request that the Court issue an order that prevents both Waples and his co-counsel from making any further comments about this case and "impose an appropriate monetary

---

[2] $550 is reportedly the hourly wage Waples used in a fee petition from an unrelated case.

4

sanction." [Dkt. 134 at 5.] For the reasons set forth below, the Court finds that Waples' actions are not sanctionable.

### A. Breach of the Protective Order[3]

The protective order in this case provides:

> In the course of discovery in this action, the parties **may** be required to produce information that constitutes, in whole or in part, protected information such as trade secrets, non-public research and development, commercial or financial information, or other information that may cause harm to the producing party or a non-party. The parties anticipate production of the following categories of protected information. . . .

[Dkt. 35 at 1] (emphasis added). The protective order then discusses the types of confidential information that a party **could** produce during this litigation such as "[v]ideo or audio recordings from the Marion County Jail obtained during the course of the MCSO Internal Affairs investigation." *Id.* at 2. However, the protective order does not provide that all information produced in discovery that falls into those categories is automatically confidential. Rather, a Designating Party must "in any reasonable manner or method 'notify' the Receiving Party of the designation level and identif[y] with specificity the information to which the designation applies." *Id.* at 4. Although the "Designating Party should stamp, affix, or embed a legend of 'CONFIDENTIAL' on each designated page of the document or electronic image," such labeling is not a *per se* requirement. *Id.*

---

[3] Medical Defendants argue that "Waples' violation of the Protective Order in this case is not an isolated incident. Instead, it is the latest example of a pattern of behavior of disrespecting and ignoring rules by Mr. Waples." [Dkt. 133 at 4]; *see also id.* at 5 ("Waples has said his instant violation was inadvertent and unknowing, yet that excuse is meaningless when it is part of a pattern of behavior."). Medical Defendants cite an example when Waples used an opposing party's statement from a settlement conference in a public filing. However, that conduct does not appear to be related to the conduct at issue in the instant action.

Waples first argues that he did not violate the protective order because MCSO never labeled the videos "CONFIDENTIAL." [Dkt. 135 at 2.] As the protective order makes clear, however, a Designating Party need only indicate to the Receiving Party that the information is confidential; the manner in which the Designating Party conveys the message is not specified. MCSO has provided the Court with email evidence that MSCO designated the videos as confidential. *See* [Dkt. 141-1 at 4] ("[W]e recognize Plaintiff's use of still images from the video and we are okay with the release of those images. That said, we still believe we need to designate the video itself as confidential."). Consequently, Waples' argument is without merit.

The fact that MCSO designated the videos as confidential, however, is not dispositive of whether Waples' actions are sanctionable. During the course of discovery, any party can mark a document, video, or audio clip confidential. For example, a party could label a lunch menu "CONFIDENTIAL." Such a designation would not magically transform an innocuous document into one that warrants the protection of the court, however, and justify keeping it out of the public record. Simply designating information as confidential is insufficient to permit under-seal filing. *Union Oil Co. of California v. Leavell*, 220 F.3d 562, 567 (7th Cir. 2000) (noting that requests to seal proceedings that are based on confidentiality orders have been uniformly rejected, unless another good cause exists). Materials that enter the court record "that influence or underpin the judicial decision are open to public inspection unless they meet the definition of trade secrets or other categories of bona fide long-term confidentiality." *Baxter Intern., Inc. v. Abbott Laboratories*, 297 F.3d 544, 545 (7th Cir. 2002); *see also In re Violation of Rule 28(D)*, 635 F.3d 1352, 1360 (Fed. Cir. 2011). Ultimately, "most portions of discovery that are filed and form the basis of judicial action must eventually be released." *Union Oil Co. of California,* 220 F.3d at 568.

Therefore, it is telling that Defendants in this case did not seek to seal the videos in question when they filed them as evidence in support of their motions for summary judgment in this case approximately one year ago. *See* [Dkt. 84; Dkt. 85]. Defendants have made no argument that these videos contain trade secrets, are protected by statute, or contain confidential information that outweighs the public's interest in these videos. Videos that involve the death of an individual while interacting with or in the custody or control of a government official or entity are of particular interest to the public. As such, although MCSO designated the videos as confidential, Defendants properly filed them as part of the public record in this case, as any motion to seal the videos would have been denied.

Defendants argue that they were harmed by Waples' actions, despite the fact that Defendants themselves placed the videos in the public record, because Waples

> deprived Defendants of their ability to prevent the harm that resulted from his violation of the protective order. Had he immediately contacted counsel for the Defendants when he realized what he did, they would have had the opportunity to move quickly for relief from this Court by seeking an order prohibiting Reuters from displaying the video as part of its story. Instead, he waited to inform Defendants of his violation until after the story ran by filing the notice, and it was too late for Defendants to take any action to ameliorate the harm. His inaction only made matters worse.

[Dkt. 134 at 2.][4] This argument is nonsensical. The videos already existed in the public realm. Even if Defendants managed to get the videos back from Reuters, Reuters only had to access the videos in the public record. Moreover, any member of the public had and still has the ability to locate and view all of the videos in the public record of this case. Simply, it is hard to imagine what argument Defendants could have made that would have resulted in the Court enjoining

---

[4] Both Defendants also imply that the Article came as a complete shock to them. Yet, Colonel James Martin of the Marion County Sheriff's Office gave an interview to Reuters for the Article. Although the Court cannot speculate as to the extent of Defendants' knowledge of the Article, Defendants were on notice about Reuters' interest in this case.

Reuters from using the videos. *See New York Times Co. v. United States*, 403 U.S. 713, 714 (1971) ("Any system of prior restraints of expression comes to this Court bearing a heavy presumption against constitutional validity.") (internal citation omitted).

While it is unclear when Waples gave these videos to Reuters, the videos in question were disseminated to the public through MCSO's public filing **five months before** Reuters published the Article. Defendants nonetheless argue that

> [e]ven if the videos were provided to Reuters after [MCSO's] submission of the videos on summary judgment, Plaintiff still violated the protective order. . . . If Plaintiff's counsel believed that the submission to the Court waived the confidential designation, such that he could turn it over to a major media outlet in the very midst of the litigation, then he should have notified the parties and challenged the designation pursuant to the terms of the Protective Order.

[Dkt. 141 at 8.] To support their argument, Defendants cite the protective order: "Unless and until the challenge is resolved by the parties or ruled upon by the Court, the designated information will remain protected under this Order." [Dkt. 35.] Although it would have been advisable for Waples to have asked the Court to lift the confidential designation prior to providing it to Reuters, the fact is that once the Designating Party intentionally files a document in the public record and does not seek to maintain it under seal, that item is no longer confidential. Thus, while Waples may have technically violated the protective order by providing the videos to Reuters without seeking leave of Court, the Court finds that no sanctions are warranted for that violation because it did not cause—and could not possibly have caused—any harm under the particular circumstances of this case.

Although the Court does not find Waples' conduct sanctionable, the Court admonishes Waples that his failure to provide the Court with an adequate timeline in this matter—specifically, the failure to make it clear whether he provided the videos to Reuters before or after MCSO filed the videos in the public record—is troubling. If Waples' disclosure happened before

MCSO filed the videos in the public record, Waples should have used the procedures provided in the protective order to ask the Court to lift the "CONFIDENTIAL" designation. In addition, Waples should have notified the Court immediately when he realized that there had been a potential breach of the protective order. It is particularly troubling to the Court that Waples appears to have survived this motion more by dumb luck than any concerted effort on his part to comply with either his professional responsibilities or the orders of this Court.

### B. Violation of the Indiana Rules of Professional Conduct

Indiana Rule of Professional Conduct 3.6 states:

(a) A lawyer who is participating or has participated in the investigation or litigation of a matter shall not make an extrajudicial statement that the lawyer knows or reasonably should know will be disseminated by means of public communication and will have a substantial likelihood of materially prejudicing an adjudicative proceeding in the matter.

(b) Notwithstanding paragraph (a), a lawyer may state:
    (1) the claim, offense or defense involved and, except when prohibited by law, the identity of the persons involved; [and]
    (2) information contained in a public record . . . .

Defendants argue that Waples' comments to reporters and during an on-camera interview violated this rule and warrant sanctions pursuant to the Court's inherent powers. For example, Medical Defendants argue that

> Waples' statements in his on-camera interview are directed against the Defendants in the pending action and are aimed at swaying public opinion, and the potential jury pool for this case, in his and his client's favor. In fact, according to Rule 3.6, a statement an attorney makes publicly which relates to 'the character, credibility, [and] reputation …' of a party is presumed to have a substantial likelihood of materially prejudicing an adjudicative proceeding.

[Dkt. 133 at 4.] Medical Defendants specifically highlight Waples' televised comments in which he states:

> The inmates tell them that hey, she was on Meth then she said she swallowed 23 Xanax pills. They take her vital signs, although because her arms are twitching

9

> so much with these spasms they can't really get great readings, but they say they're all within normal limits, she must be faking it. Let's take her out of this female holding cell and put her in a single cell and just observe her on a video monitor, not a medical observation. They admit it's not a medical observation. The nurses never come and see her again. The officers that are watching her aren't trained, medically trained to provide any kind of medical care and they basically say, well the only thing we do is if she stops breathing we call the medical. Well, by the time she stopped breathing, which was a couple hours later, and they called medical, it was too late. She was brain dead.

[Dkt. 142 at 4] (transcribing the on-camera interview starting at 5:04 minute mark). Medical Defendants argue that these comments impugn the character of the Wellpath nurses.

It is a natural part of the adversarial proceeding that claims made in public filings will not always be favorable or kind to an opposing party. In determining whether Waples' public comments violated Indiana Rule of Professional Conduct 3.6, it is of critical importance to consider section (b) of the rule, something that neither set of Defendants seems to have considered.[5] The rule does not prohibit Waples from discussing "the claim, offense or defense

---

[5] Defendants' case citations are also not persuasive. The Indiana Supreme Court in *In the Matter of Steven C. Litz,* 721 N.E.2d 258, 260 (Ind. 1999), found an attorney's "letter to the editor" sent to local newspapers created a substantial likelihood of prejudicing the adjudicative proceedings. The attorney "stated his client had committed no crime, criticized the prosecutor's decision to retry the case, and mentioned that his client had passed a lie detector test." *Id.* at 258. The court publicly reprimanded the attorney for his conduct since Indiana Rule of Professional Conduct 3.6(d) creates a rebuttable presumption that statements regarding guilt and test results that are inadmissible at trial (such as a lie detector test) are prejudicial. *Id.* at 259-60. "Further, the [attorney's] identification of the prosecution's decision to retry the case as 'abominable,' despite the fact that retrial of the case was well within the prosecutor's discretion, tended to contribute to a pre-trial atmosphere prejudicial to the prosecution's case." *Id.* at 260. Also in a criminal case, the Indiana Supreme Court in *In re Matter of Carl J. Brizzi,* 962 N.E.2d 1240 (Ind. 2012), issued a public reprimand against a prosecutor for violating "Indiana Professional Conduct Rules 3.6(a) and 3.8(f) by making public statements as a prosecutor that had a substantial likelihood of materially prejudicing an adjudicative proceeding and a substantial likelihood of heightening public condemnation of the criminal defendants." *Id.* at 1249. Of particular concern to the court were statements such as "I would not trade all the money and drugs in the world for the life of one person, let alone seven. Turner deserves the ultimate penalty for this crime," and "There are several aggravators present, any one of which would merit the death penalty. To do otherwise would be a travesty." *Id.* at 1242-43. Waples neither violated an explicit provision of Indiana

10

involved" and "information contained in a public record."  By the time Reuters published the

Article, Plaintiff had filed a complaint [Dkt. 1], agreed to a case management plan discussing its

position [Dkt. 34 at 3], and filed briefs relating to summary judgment [Dkt. 97; Dkt. 98; Dkt.

107; Dkt. 127; Dkt. 128].  In other words, the record reflected a substantial amount of

information regarding Plaintiff's claims, including Plaintiff's version of the facts.  In fact, all of

the statements Medical Defendants highlight are found in Plaintiff's complaint:

- "Other female inmates observed Kyra in obvious need of medical attention and summoned custody and nursing staff to help her." [Dkt. 1 at 3.]

- "The nurses and deputies encountered Kyra who was demonstrating signs of drug overdose distress, including seizure-like activity and involuntary movement such as twitching, jerking, and uncontrollably shaking of her hands and arms. . . . The nurses and custody staff decided to remove Kyra from the female holding cell and place her in a single cell. . . . This decision to isolate Kyra in a single cell followed the policy and practice of the Marion County Sheriff and Correct Care Solutions to remove inmates undergoing drug overdoses from the facility's general population, place them into single cells, and not provide them adequate medical assessment and monitoring." *Id.* at 4.

- "Nurses Carpenter, Hansen, and Wischmeyer should have provided Kyra emergency medical attention by sending her to the hospital instead of letting her go to single cell without any medical assessment or treatment." *Id.* at 4-5.

- "At approximately 7:45 p.m., custody staff found Kyra mostly still with occasional twitching on the ground.  Two deputies entered the cell while another deputy stood outside of the cell and observed.  These three deputies are identified below as Deputies One, Two, and Three.  The deputies attempted to stand Kyra up on her feet.  When the deputies let go of her, Kyra fell to the ground, hitting her head on the cell walls as she fell. . . While on ground of the cell floor, Kyra experienced involuntary, seizure-like activity in the presence of three deputies. . . . Rather than assist Kyra or call for medical attention, the three deputies exited the cell and again left Kyra alone in the solitary cell." *Id.* at 6.

- "At approximately 9:21 p.m., approximately two hours after being placed alone in the solitary cell, jail medical staff arrived at Kyra' solitary cell and examined her.  She was unresponsive. . . .  As a result of not receiving emergency medical

---

Rules of Professional Conduct 3.6 nor made statements that a reasonable attorney would see as clearly prejudicial.

    care for her acute drug overdose, Kyra had experienced acute hypoxic respiratory failure, PEA (pulseless electrical activity), cardiac arrest, and suffered a severe anoxic brain injury." *Id* at 14-15.

- "Kyra never regained consciousness and had no meaningful neurologic activity at the hospital." *Id.* at 15.

Consequently, Waples only reiterated his client's position and discussed information any member of the public could have located in the public docket.

    In reality, it seems that Defendants find fault with Reuters' reporting. *See* [Dkt. 134 at 2] (Waples "statements were clearly intended to present Plaintiff's version of the facts and, conversely, to place the MCSO defendants in a very poor light by omitting many other important facts showing why the MCSO and its employees are not responsible for Warner's death."). Waples should not be held responsible for Reuters' decision to not provide "other important facts showing why the MCSO and its employees are not responsible for Warner's death." *Id.* Defendants' true grudge lies not with Waples, but with Reuters.

### III. CONCLUSION

    For the reasons set forth above, the motions for sanctions filed by Medical Defendants [Dkt. 133] and MCSO [Dkt. 134] are **DENIED**.

    SO ORDERED.

Dated:  20 MAY 2021

                                           Mark J. Dinsmore
                                           United States Magistrate Judge
                                           Southern District of Indiana

Distribution:

Service will be made electronically
on all ECF-registered counsel of record via
email generated by the court's ECF system.